IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 0:17-cv-61485-DMM

KEN GRIER and CARMEN GRIER, his wife,

    Plaintiffs,

vs.

ALLIED VAN LINES, INC., and
SIRVA, INC.,

    Defendants.
_____/

## AMENDED COMPLAINT

Plaintiffs, KEN GRIER and CARMEN GRIER, his wife, ("GRIER"), by and through their undersigned counsel, hereby sue the Defendants, ALLIED VAN LINES, INC., a foreign corporation ("ALLIED") and SIRVA, INC., a foreign corporation, ("SIRVA"), and all facts being extant and material hereto alleges as follows:

### INTRODUCTION

1. This is an action for breach of a contract of carriage (which is subject to 49 U.S.C. § 14706 (the "Carmack Amendment")) arising from the theft of and damage caused to the GRIERS' goods by a carrier, Defendant ALLIED, hired on or about August 28, 2014, through its originating and booking agent Griffin Moving & Storage, Co. Inc. ("Griffin"), to transport the GRIERS' goods by truck from Sunny Isles Beach, Florida to Hendersonville, North Carolina.

2. This is also an action for breach of contract and good faith and fair dealing against Defendant, SIRVA, the coverage "Provider" for an "Extra Care Protection Plan" that the GRIERS' had to cover loss of or damage to their goods.

1

**Exhibit "2"**

## THE PARTIES

3. Plaintiffs, KEN GRIER and CARMEN GRIER, at all material times herein were residents of Miami-Dade County but now reside in Hendersonville, North Carolina and are, in all respect, *sui juris.*

4. Defendant, ALLIED, is an Indiana corporation authorized to do and doing business in Broward County, Florida. ALLIED is a trucking carrier that transports goods for individuals making interstate moves. ALLIED generates business and revenue through its originating and booking agent, Griffin Moving & Storage Co. Inc., a Florida company.

5. Defendant, SIRVA, is an Illinois corporation that has done business and is doing business in Broward County, Florida. SIRVA is engaged in the business of, *inter alia,* providing protection plans for goods in transit. At all relevant times, SIRVA covered the GRIERS' goods against transit-related loss and damage.

## JURISDICTION & VENUE

6. This action involves interstate transportation by motor carrier. This honorable Court has jurisdiction pursuant to 49 U.S.C. § 14706 (or the "Carmack Amendment") and 28 U.S.C. § 1331.

7. Venue is proper in this Honorable Court pursuant to 49 U.S.C. § 14706(d).

8. Alternatively, this Honorable Court has jurisdiction pursuant to 28 U.S.C. § 1332.

## GENERAL ALLEGATIONS

9. In or around August, 2014, as part of the GRIER's search for a moving company to assist with their intent to relocate from Sunny Isles Beach, Florida to Hendersonville, North Carolina, Mr. GRIER contacted Griffin as originating and booking agent of Defendant, ALLIED, and was put in contact with Ryan Griffin, an agent, employee or servant of Defendant, ALLIED.

10. While speaking with Mr. Griffin, Mr. GRIER advised that, because, during the course of their lives, the GRIERS had collected, *inter alia*, valuable antique furniture, silver, stained glass, chandeliers and glassware (such as Lalique, Steuben, and Baccarat Nancy, to name a few), treasured artwork (such as Meissen porcelains, Majolica pottery, Limoges collections dating back to the early 1800's and into the 1900's, among others) as well as expensive and unique paintings and draperies, the GRIERS were seeking an experienced company to successfully complete the GRIERS' packing, storage and delivery needs.

11. In response, Ryan Griffin, as agent, employee or servant of Defendant, ALLIED, advised Mr. GRIER that Griffin had been in business for many years, had extensive experience with valuables and antiques of this nature and that, if the GRIERS contracted with ALLIED, through its agent Griffin, they would have "nothing" to worry about.

12. Thereafter, Mr. Griffin, as agent, employee or servant for Defendant, ALLIED, visited the GRIERS' home to prepare an estimate of costs for the GRIERS' total packing, storage and delivery needs.

13. While at the GRIERS' home, Mr. GRIER clarified with Mr. Griffin that, in addition to the property within the home, the GRIERS also had an offsite, 10x10 storage unit that contained personal items that needed to also be packed, shipped and delivered with the other property at the GRIERS' home.

14. Mr. Griffin as agent, employee or servant of Defendant, ALLIED, assured the GRIERS that Griffin and ALLIED were fully equipped and experienced to handle such a significant job. To reiterate that point and to induce the GRIERS to contract with Griffin, as originating and booking agent of Defendant, ALLIED, Mr. Griffin provided the GRIERS with Griffin's marketing materials wherein GRIFFIN touted itself as a reliable and trustworthy

3

company that "has been moving families and businesses for over 50 years in South Florida." (Exhibit "A").

15. In fact, Griffin's opening brochure language posits: "Choosing a mover is an important decision. Who can you trust with your valuable belongings?" Id. And, within its brochure, Griffin highlighted that "[s]torage is available at our modern, climate controlled and secure warehouse. One of the few storage facilities in South Florida built entirely of concrete, roof and all." Id.

16. Thereafter, on or around August 28, 2014, Griffin provided the GRIERS with a quote for packing, storing and moving **all** of the GRIERS' possessions. (Exhibit "B").

17. However, on the same day, as a further inducement to gain the GRIERS' business, Griffin as agent, employee or servant of Defendant, ALLIED, provided a second quote, reducing the initially quoted price by thirteen hundred dollars ($1,300.00). (Exhibit "C")

18. Moved by the above noted inducements, the GRIERS accepted the second quote and contracted with Griffin, as originating and booking agent for Defendant, ALLIED, but inquired as to coverage protection options, reiterating that their personal property was extremely valuable and, in many personal respects, irreplaceable.

19. Mr. Griffin, as agent, employee or servant for Defendant, ALLIED, advised the GRIERS that there was a $200,000.00 protection plan available to them, but that they did not need that because Griffin, as originating and booking agent of Defendant, ALLIED, was entirely trustworthy and reliable.

20. Although the GRIERS were extremely confident in Griffin as agent for Defendant, ALLIED, due to Mr. Griffin's representations, out of an abundance of caution, the

GRIERS proceeded with the coverage protection with Defendant, SIRVA, whom is named as the "Provider" of the "Extra Care Protection Plan". (Composite Exhibit "E")

21. In addition to the "Extra Care Protection Plan", the GRIERS also specifically wrote, as instructed, on the "HIGH VALUE INVENTORY" form that the "Whole shipment is comprised of antiques and valuable items such as Lalique crystal, Meissen/Steuben glass, Royal Vienna and antique mirrors and furniture Majolica pcs etc." (Composite Exhibit "E")

22. In fact, a Griffin employee, agent or servant of Defendant, ALLIED, initialed the GRIERS' above noted writing accepting the GRIERS' memorialization that "[a]ll items included in [the GRIERS'] shipment [were] considered to be of extraordinary (unusual) value[,]" while the GRIERS did not initial beside the language "I HAVE NO HIGH VALUE ITEMS IN MY SHIPMENT" on the "HIGH VALUE INVENTORY" form. *Id*.

23. With regard to the "BILL OF LADING – CUSTOMER'S DECLARATION OF VALUE" form, the GRIERS did not input the typewritten "$200,000.00" beside the language (to be provided by the customer), and Griffin, as originating and booking agent to Defendant, ALLIED, failed to complete the portion of the form that was required "(to be provided by carrier)." *Id*. Consequently, the GRIERS maintain that their "[w]hole shipment is comprised of antiques and valuable items[,]" and Griffin's, as agent of Defendant, ALLIED, initials[1] ratify the GRIERS' written statement, providing the GRIERS "Full (Replacement) Value Protection" of the entirety of any and all of the GRIERS' lost, stolen or damaged goods at issue.

24. Thereafter, on or around September 29, 2014, Griffin sent agents, employees or servants, in an ALLIED truck, to the GRIERS' home to begin packing the GRIERS' belongings and to start disconnecting things such as chandeliers, lighting fixtures, sconces, televisions,

---

[1] The same initials of the Griffin employee, acting as agent for Defendant, ALLIED, appear on the "ORDER FOR SERVICE" form.

5

speakers and ceiling fans, which items were also to be safely packed and shipped to the GRIERS new, North Carolina home. The scheduling of this effort was memorialized by Mr. Griffin, as originating and booking agent for Defendant, ALLIED, on September 18, 2014. (Exhibit "E")

25. Ultimately, Griffin as an agent of Defendant, ALLIED, packed the entirety of the GRIERS' home onto its trucks, leaving the GRIERS' home completely empty.

26. However, while packing up the GRIERS' Florida home, Griffin as ALLIED's agent, employee or servant significantly damaged the GRIERS' floor.

27. Next, Griffin, as agent of Defendant, ALLIED, dispatched another ALLIED truck to the aforementioned 10x10 storage unit where two (2) Griffin employees, as agent for ALLIED, loaded the items onto the ALLIED truck. However, Griffin, as agent for ALLIED, did not safely pack the items removed from the storage unit; instead, the GRIERS were advised that those items would be properly packed at Griffin's onsite facility.

28. The GRIERS were also, again, led to believe that all of their items – a lifetime of precious collections and possessions – would be stored in a temperature controlled area, free from any threats of weather damage.

29. The GRIERS never saw their property again until it was delivered to their North Carolina home on August 17, 2015; however, even then, the GRIERS did not see all of their property because, as more thoroughly discussed below, numerous items, including ten (10) to fifteen (15) boxes of the GRIERS' possessions, were never delivered, while other items were significantly damaged.

30. In fact, because so much of the GRIERS' property was not delivered and/or was damaged, Mr. Grier refused to sign the customer check-off sheet, specifically advising that

6

Defendant ALLIED should take his unwillingness to sign as notice that the delivery did not comply, was insufficient and unacceptable. (Exhibit "G")

31. However, upon information and belief, the agent, employee or servant of Griffin, acting as agent to ALLIED, that was responsible for completing these forms misrepresented, on the same forms that the GRIERS refused to sign, that "Customer did check everything off"; however, that statement is false.

32. And, a customer check-off sheet later presented to the GRIERS was significantly different than the customer check-off sheet the GRIERS last saw, which, upon information and belief is due to unilateral alterations made by the agent, employee or servant of Griffin, acting as agent to ALLIED. (Composite Exhibit "H")

33. Indeed, Mr. GRIER was unequivocally clear that "everything" had _not_ been delivered, while other goods were delivered with damages.

34. In that respect, on the same day, August 17, 2015, the GRIERS immediately advised Mr. Griffin, as agent, employee or servant of Defendants ALLIED, that Griffin had "destroyed [the GRIERS'] dreams and memor[ies]". (Exhibit "I")

35. Similarly and consistent with their aforementioned notation that the "whole shipment is comprised of antiques and valuable items[,]" the GRIERS promptly notified Defendant, ALLIED, through its agent Griffin, of the damages suffered by meticulously outlining, in a line-by-line itemization, one million one hundred seventy-one thousand three hundred two and 90/100 dollars ($1,171,302.90) of estimated damages.

36. In response, the GRIERS were contacted by Defendant, SIRVA regarding their "claim". (Exhibit "H")

7

37. Initially, Defendant, SIRVA, accepted responsibility for damaging the GRIERS' mattress and sent a check to compensate for that damage, although that check wrongly deducted $500 as a deductible; however, Defendants, SIRVA and ALLIED, have failed to take responsibility and/or compensate the GRIERS' for the significant damages caused by the theft of and damage to the GRIERS' goods, notwithstanding continued good faith efforts by the GRIERS to resolve the issues.

38. Regarding the GRIERS' above noted "claim," Dianne Schuenke, of Defendant, SIRVA, sent a letter to the GRIERS on August 21, 2015, stating that Furniture Craftsman, a local North Carolina company, had been hired to adjust the GRIERS' claim. (Exhibit "J")

39. However, despite the fact that a Furniture Craftsman employee, Mike Powers, spent two (2) days estimating and appraising the GRIERS' damages, Defendant SIRVA, refused to provide the GRIERS with Mr. Powers' documentation and completely disregarded Mr. Powers' Inspection Report as part of its claims analysis, refusing, to this day, to provide the GRIERS with any information from Furniture Craftsman and/or Mike Powers.

40. Instead, Defendant SIRVA, arranged for a different adjuster, Mr. Dennis Bell, of The Finishing Touch of the Carolinas, Inc. to do a second, subsequent inspection, which did not occur until October 14, 2015. Besides the curiousness of ignoring Mr. Powers and Furniture Craftsman's Inspection Report, considering it was Defendant, SIRVA, that hired them, Defendant, SIRVA, admitted in its correspondence with the GRIERS' that Mr. Bell, was asked to bring a certified appraiser with him to the GRIERS' home, which he did not, and that "Allied Van Lines has worked with [Mr. Bell] for many years." (Exhibit "K")

41. Upon information and belief, Defendant, SIRVA, retained Mr. Dennis Bell, of The Finishing Touch of the Carolinas, Inc. to do the second Inspection Report because it knew

Mr. Bell would provide them documentation that Defendant, SIRVA, could use to wrongfully minimize the ultimate payout on the GRIERS' claim.

42. Indeed, upon information and belief, this is why Defendant, SIRVA, refused and continues to refuse to provide Mr. Powers' and/or Furniture Craftsman's Inspection Report to the GRIERS and why Mr. Bell did not actually bring a certified appraiser with him as represented in SIRVA's letter to the GRIERS.

43. Moreover, Mr. Bell's unwillingness to review and/or incorporate numerous emails, pictures and valuations submitted to SIRVA by the GRIERS, contemporaneously with their continued discovery of missing items and damages, during the claims process, casts doubt on the reliability of Mr. Bell's and/or The Finishing Touch of the Carolinas, Inc.'s ability to be impartial, fair and/or honest in its dealings with the GRIERS' claim.

44. Indeed, after Mr. Bell's inspection, while the GRIERS were precluded from receiving and/or reviewing Mr. Power's and/or Mr. Bell's respective Inspection Reports, Defendant, SIRVA continued to represent to the GRIERS' that **it was** directly in touch with Mr. Bell as they worked towards a final position on the GRIERS' claim.

45. After a month of no substantive answers, Defendant, SIRVA, represented that it received Mr. Bell's Inspection Report, on or around November 17, 2015.

46. However, Defendant, SIRVA, did not provide the Inspection Report to the GRIERS at that time. Instead, Defendant, SIRVA, refused to discuss the information within that Inspection Report and continued to refuse to provide Mr. Powers' Inspection Report, while it delayed its claims decision even longer.

47. In the end, Defendant, SIRVA, used the aforementioned, subsequently arranged for second Inspection Report to deny almost the entirety of the GRIERS' claim, still refusing to

9

allow the GRIERS the opportunity to differentiate between the Furniture Craftsman and/or Mike Powers Inspection Report against Mr. Bell's and/or The Finishing Touch of the Carolinas, Inc.'s Inspection Report.

48. Highlighting these extremely unorthodox circumstances was Mr. Bell's statement, within the Inspection Report, that: "Our [or The Finishing Touch of the Carolinas, Inc.'s] position **has always been** the items do not exist and this is **a case of insurance fraud**!" (Exhibit "K") (**Emphasis added**.)

49. To be sure, it is beyond unusual that any "independent" or "outside" adjuster would come into any claim situation, much less one involving this many antiques and valuables, with a preconceived notion and "position" that the GRIERS' had "always been" trying to commit "insurance fraud!"

50. In addition to these highly irregular circumstances, the GRIERS advised Defendants, SIRVA and ALLIED, that, while continuing to unpack boxes, they came across personal items of others that were improperly mixed into boxes with the GRIERS' belongings, which evidenced that the GRIERS' personal items had been tampered with before delivery.

51. In fact, in one instance, the GRIERS discovered – in boxes with their personal items – another child's lost teeth, which a parent and/or child seemed to have collected, with notes that the child had written to the Tooth-Fairy. Since the GRIERS' knew this was not theirs, they not only advised all Defendants of this, they worked to find the rightful owners of these items and shipped them their things, at the GRIERS' own expense.

52. Yet, Defendant, SIRVA, ignored all of this and offered only $17,855.00 as a full and final offer to settle the GRIERS' claim, despite claims that the "Extra Care Protection Plan" had $200,000.00 of coverage.

53. The GRIERS' rejected the offensive offer, SIRVA never made another offer and, despite taking numerous steps to mitigate their damages, the GRIERS have significant damages still unresolved.

54. Indeed, like Defendant, SIRVA, Defendant, ALLIED, has completely disregarded its initialed acceptance of the GRIERS' written compliance with the "HIGH VALUE INVENTORY" form, which expressly and explicitly stated that the "[w]hole shipment is comprised of antiques and valuable items[,]" steadfastly maintaining that, contrary to the GRIERS' position, the GRIERS cannot recover the entirety of their loss (estimated at more than one million one hundred seventy-one thousand dollars ($1,170,000.00)).

55. As a result, this lawsuit follows the Defendants aforementioned acts and violations of Florida and Federal law.

56. All conditions precedent to bringing this action have been satisfied and/or are waived and/or excused due to Defendants, ALLIED and/or SIRVA's, conduct.

57. Plaintiffs have retained the services of the undersigned and have agreed to pay a reasonable attorneys' fee on a contingency basis.

### COUNT I – *BREACH OF CONTRACT OF CARRIAGE SUBJECT TO THE CARMACK AMENDMENT* AGAINST DEFENDANT, ALLIED

58. Plaintiffs reallege and incorporate the allegations set forth in paragraphs 1-57 above as though fully restated herein.

59. In or around October, 2014, Plaintiffs, the GRIERS', contracted with Defendant, ALLIED, through its disclosed originating and booking agent, Griffin, and expressly outlined, among other terms, the following that was to be strictly complied with by Defendant, ALLIED:

> SECTION 1. The carrier or party in possession ***shall be liable for physical loss of or damage to any articles from external cause while being carried or held in storage-in-transit*** EXCEPT loss, or damage cause by or resulting:

11

  (a) From an act, omission or order of shipper;
  (b) From a defect or inherent vice of the article, including susceptibility to damage because of atmospheric conditions such as temperature and humidity or changes therein;
  (c) From (1) hostile or warlike action in time of peace or war . . .
  (d) From delay caused by strikes, lockouts . . .
  (e) From acts of God;

(Exhibit Composite "E") (*Emphasis added*.)

60. Further, the GRIERS specifically wrote, as instructed, on the "HIGH VALUE INVENTORY" form that the "Whole shipment is comprised of antiques and valuable items such as lalique crystal, Meissen/Steuben, Royal Vienna and antique mirrors and furniture Majolica pcs. etc[,]" and this written memorialization was initialed by a Griffin employee, agent or servant of Defendant, ALLIED to confirm that "[a]ll items included in [the GRIERS'] shipment [were] considered to be of extraordinary (unusual) value[.]" (Composite Exhibit "E")

61. With regard to the "BILL OF LADING – CUSTOMER'S DECLARATION OF VALUE" form, the GRIERS did not input the typewritten "$200,000.00" beside the language (to be provided by the customer), and Griffin, as originating and booking agent to Defendant, ALLIED, failed to complete the portion of the form that was required "(to be provided by carrier)." *Id*.

62. Consequently, the GRIERS maintain that their "[w]hole shipment is comprised of antiques and valuable items[,]" and Griffin's, as agent of Defendant, ALLIED, initials ratify the GRIERS' written statement, providing the GRIERS "Full (Replacement) Value Protection" of the entirety of any and all of the GRIERS' lost, stolen or damaged goods at issue.

63. Further, as an interstate motor carrier of goods for hire subject to the Carmack Amendment, ALLIED was obligated to safely transport, handle, carry, keep, care for, and deliver the GRIERS' goods in the same condition as when received by ALLIED.

64. However, Defendant, ALLIED, through its agent Griffin, breached these terms as more specifically stated herein.

65. Although the GRIERS timely made a written claim for these losses, the GRIERS' damages have still not been compensated by Defendant, ALLIED.

66. As a direct and proximate result of Defendant, ALLIED's, breach of its contract with the GRIERS, Plaintiffs sustained damages estimated at over one million one hundred seventy-one thousand dollars ($1,170,000.00).

WHEREFORE, Plaintiffs, KEN GRIER and CARMEN GRIER, demand judgment for breach of contract against Defendant, ALLIED VAN LINES, INC., plus interest on all liquidated sums, costs and reasonable attorneys' fees pursuant to terms of the contract between GRIER and ALLIED and demands a trial by jury for all issues so triable.

### COUNT II - BREACH OF CONTRACT AND GOOD FAITH AND FAIR DEALING AGAINST DEFENDANT, SIRVA

67. Plaintiffs reallege and incorporate the allegations set forth in paragraphs 1-57 above as though fully restated herein.

68. As noted herein, the GRIERS contracted with Defendant, ALLIED, through its originating and booking agent, Griffin.

69. However, separate from that contract was an "Extra Care Protection Plan" of which Defendant, SIRVA, was listed as the "Provider".

70. As the "Provider" to that "Extra Care Protection Plan", Defendant, SIRVA took on an implied covenant of good faith and fair dealing.

71. The implied covenant of good faith and fair dealing required SIRVA to be honest in its dealings and not purposefully take actions that would unfairly prevent other parties

from enjoying their rights or benefits under the contract or disappoint their reasonable expectations.

72. The implied covenant of good faith and fair dealing further requires that, even when a contract confers decision-making power on a single party, the resulting discretion is nevertheless subject to an obligation that it be exercised in good faith and observe reasonable limits in exercising that discretion, consistent with the parties' purpose or purposes in contracting.

73. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit not merely the letter-of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

74. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, or abuse of a power to specify terms and interference with or failure to cooperate in the other party's performance.

75. Defendant, SIRVA, has breached the "Extra Care Protection Plan" contract (which Plaintiffs do not have in their possession, but requested through discovery) as well as the covenant of good faith and fair dealing contained therein for the following reasons.

76. First, Defendant, SIRVA's, "Extra Care Protection Plan" is (1) an insurable interest; (2) that carries a risk of loss; (3) with an assumption of the risk by SIRVA; (4) is comprised of a

general scheme to distribute the loss among the larger group of persons bearing similar risks; and, (5) requires the payment of a premium for the assumption of risk.

77. Thus, the "Extra Care Protection Plan" is insurance per Fla. Stat. §624.02, which defines "Insurance" as "a contract whereby one undertakes to indemnify another or pay or allow a specified amount or a determinable benefit upon determinable contingencies."

78. Indeed and as stated herein, Defendant, SIRVA, charged the GRIERS a premium, a "deductible" when it submitted payment for a damaged mattress, advised the GRIERS in writing that their claim "adjuster is Dianne Schuenke" whose signature states: "Best Regards, Dianne Schuenke Allied Claims Dept." (Exhibit "H") and referred to the entire process as the "claim process[.]" (Exhibit "I").

79. Second, Defendant, SIRVA, refused to provide all information obtained by Furniture Craftsman and/or Mike Powers as well as Dennis Bell and/or The Finishing Touch of the Carolinas, Inc.'s so that it could wrongly deny the GRIERS' claim.

80. In fact, this claims denial was supported by Mr. Bell's statement, within the Inspection Report that: "Our position has always been the items do not exist and this is a case of **insurance fraud**!" (Exhibit "J")

81. As a direct and proximate result, Defendant, SIRVA, directly and materially breached the subject contract as well as the covenant of good faith and fair dealing, causing the GRIERS to sustain damages estimated at over one million one hundred seventy-one thousand dollars ($1,170,000.00), an amount far surpassing the "Extra Care Protection Plan" coverage.

WHEREFORE, Plaintiffs, KEN GRIER and CARMEN GRIER, his wife, demands judgment for breach of contract damages and breach of the covenant of good faith and fair dealing in excess of $200,000.00 against the Defendant, SIRVA, INC., plus interest on all

liquidated sums, costs and attorneys' fees pursuant to Fla. Stat. §627.428 and demands a trial by jury for all issues so triable.

DATED this __9th__ day of __November__, 2017.

                                LIGGIO LAW, PA
                                The Barristers Building, Ste. 3B
                                1615 Forum Place
                                West Palm Beach, FL 33401
                                Telephone:    (561) 616-3333
                                Facsimile:    (561) 616-3266
                                Email: emailservice@liggiolaw.com
                                                jliggio@liggiolaw.com
                                                gstahl@liggiolaw.com

                                */s/Geoff S. Stahl*
By: _____
                                GEOFF S. STAHL, ESQ.
                                Florida Bar No.: 89240
                                JEFFREY M. LIGGIO
                                Florida Bar No.: 357741